John Buchannon and others, Complainants, *v.* Edwin Upshaw, Respondent.

(Mr. Chief Justice Taney did not sit in this cause.)

There were two titles to a tract of land, the senior title held by Upshaw, and the junior by Buckner, both derived from the same person who had sold to both.

Buckner soon afterwards sold to Buchannon, who paid Buckner and took possession.

Upshaw subsequently agreed to ratify the sale from the original holder to Buckner, upon receiving an assignment of Buckner's bond for the purchase money, not yet due, and other securities.

The bond not being paid, Upshaw brought an ejectment and obtained a judgment. Buckner's assignees filed a bill to obtain a perpetual injunction.

There is a privity of contract between them and Upshaw, and a perpetual injunction will be granted upon their fulfilling the obligations of Buckner, their assignor; it was not their duty, under the circumstances, to have *tendered* the money to Upshaw.

A power in Buckner to resell, and a sale made under that power, prior to Upshaw's giving his assent to the sale from the original holder to Buckner himself, did not extinguish the equitable right of Upshaw to receive the purchase money, or to proceed against the land.

Upshaw's right not destroyed by lapse of time, because he had brought suit on Buckner's bond and the other securities, and was not in a condition for a long time to make a valid title.

Upshaw, being held bound by his assent to the sale to Buckner, is entitled to the advantage which that paper gave him as to the application of part of the purchase money to one purchase in preference to another.

Interest must begin to run from the time when Upshaw asserted his claim to the land, and what is due to Upshaw must be made up by the present holders of the land, each one contributing in proportion to the price which he paid to Buckner.

This was an appeal from the Circuit Court of the United States for the district of Ohio, sitting as a court of chancery.

The case was this:

John Buchannon and others filed a bill in the Circuit Court of Ohio against Upshaw, stating that Upshaw had obtained a judgment in an action of ejectment against them, and praying for two things: 1. That he, Upshaw, might be perpetually enjoined from proceeding in execution upon said judgment; and, 2. That he might be compelled to convey by deed in fee simple, the land

which had been the subject of the suit in ejectment.   The Circuit Court, after various proceedings, decreed that the injunction which had been temporarily granted, restraining Upshaw from suing out executions upon his judgment in ejectment, should be dissolved; that the bill should be dismissed, and that Buchannon and others should pay to Upshaw a certain sum of money for the rents and profits, after deducting the value of the improvements made upon the land.   From this decree an appeal was taken to this court.

On the 11th of December, 1789, Beverly Roy obtained from the commonwealth of Virginia a patent for one thousand acres of land in the Virginia military district of Ohio, and within Clermont county.   He sold three hundred acres of this tract to one Buchannon, and contracted to convey the remaining seven hundred (the land in controversy in the present suit) to Lyne Shackleford.

On the 10th April, 1797, Shackleford sold this tract of seven hundred acres to Upshaw, the defendant in the present appeal; but not having the legal title in himself at that time, he procured it to be made directly from Roy to Upshaw, without passing through himself.   On the 20th of July, 1797, Roy accordingly executed a conveyance to Upshaw for these seven hundred acres, and also a bond for further assurance.

On the 16th November, 1797, Shackleford, being thus destitute of the legal title, nevertheless sold to Philip Buckner, the same tract of seven hundred acres which he had previously sold to Upshaw.   It was alleged in the bill that this sale was made with Upshaw's consent, but no evidence of it was furnished, except that in the contract of 1801 his consent is stated to be given at some time prior to 1801.   At the same time, Shackleford sold also to Buckner another tract of one thousand acres.   The price for both tracts was £1020, without saying what was the sum for each tract.   No part of it was to be paid in cash.   A bond of Anderson for £600 held by Buckner was assigned to Shackleford; a claim against Coats for £250 was also assigned over; and for the balance Shackleford agreed to wait until Buckner sold the one thousand seven hundred acres, provided he sold it prior to January, 1799; if not, payment to be then made, or sooner if Buckner should sell.

In 1798 and 1799, Buckner sold to the complainants, or to those

under whom they claim, in several parcels, the whole of the seven
hundred acres in question, who paid him in full therefor, re-
ceived conveyances, and entered into possession.

On the 18th of April, 1801, Upshaw, having made some pay-
ments to Shackleford, entered into a new contract with him, which
was endorsed on the original one, stating " that since the date of
the within, Shackleford had, with the consent of Upshaw, sold
the seven hundred acres of land to Buckner for £420, which sum
is still due;" and it was agreed that Shackleford should assign
Buckner's contract to Upshaw, who was to make a deed as soon
as the money should be paid.    But if, upon application, Buck-
ner did not pay the said sum of money and interest, Upshaw was
immediately to take proper steps to have the land sold to raise
the money and interest.

On the 16th of May, 1803, Shackleford assigned to Upshaw
the contract between Shackleford and Buckner, and authorized
Upshaw to receive from Buckner the balance due on the same,
amounting on that day to £530 9*s.*, having previously assigned
the claim upon Coats's bond, and an order which Buckner had
given upon one Copland, the attorney who was charged with its
collection.    The result of that claim may be stated in a few words.
Suit was brought in the Circuit Court of the United States at
Richmond, by John Marshall, in 1798, against Coats : there was
a judgment, a *ca. sa.*, another *ca. sa.*; and, finally, it got into
chancery against Coats's widow and children.    The plaintiff at
last gave it up in 1820.

Upshaw made more than one effort to obtain the money from
Buckner, which was due under the contract assigned by Shackle-
ford.    In April, 1804, he empowered John H. Upshaw, who was
going to Kentucky, to receive from Buckner the sum due on his
contract, and on the payment of the money, the agent was au-
thorized to make a deed.

The agent called on Buckner, who expressed much anxiety
to comply with his contract, and induced the agent to remain
some days, in the hope of raising the money.    But he failed to
pay any part of it.    The agent, after authorizing John O'Bannon
to receive the money from Buckner, and make him a deed, re-
turned to Virginia.

Upshaw drew an order on John O'Bannon in April, 1807, for

the money, which was returned protested for non-acceptance. O'Bannon shortly after this died, and in the year 1813, or 1814, Upshaw obtained from his representatives the assigned contract of Buckner, which had been left with him, and on which was endorsed a credit for $100 on the 10th April, 1805, and another for the same amount, 18th April, 1806. On obtaining the contract, Upshaw caused an action to be brought on it against Buckner for the money. The suit being brought in the name of Upshaw, as assignee of Shackleford, there was a demurrer to the declaration; and at May term, 1815, the Circuit Court of the United States for Kentucky sustained the demurrer, and the action failed.

Shortly after this, Upshaw commenced an action of ejectment, in the Circuit Court of the United States for the district of Ohio, against Buchannon and others, who occupied the land, to recover possession of it, which, at May term, 1816, failed, on the ground that the patent emanated from the state of Virginia, subsequently to the deed of cession from Virginia to the United States; and of course Upshaw was only invested with the equitable title to the land.

In August, 1817, Roy and wife executed another deed to Upshaw for the land, in compliance with the covenant for further assurance, which he had entered into in 1797.

Some short time prior to December, 1820, Buckner died. His will, made in February, 1817, contains bequests of real estate and some small legacies of personalty. The executor filed two accounts, one in 1822, and the other in 1823, the latter showing a balance in the hands of the executor of $50 18 cent . It does not appear that any of his real estate was required to be sold to pay debts.

In 1826, Upshaw obtained from the United States a patent for the seven hundred acres.

In 1829, he brought another ejectment, in the Circuit Court of the United States for the district of Ohio, against Buchannon and others, occupiers of the land, and having now a patent from the United States, succeeded in obtaining judgment; upon which, Buchannon and others filed a bill upon the equity side of the same court, and obtained an injunction to stay proceedings. This is the bill mentioned in the commencement of this narrative,

which, upon hearing, was dismissed by the Circuit Court, and the injunction dissolved; and the case now came up by an appeal from that decree.

The proceedings in this case were diversified in its history, by two collateral chancery suits, one by John H. Upshaw against E. Upshaw, and another by E. Upshaw against Chamberlayne, the executor of Shackleford; but as the decision of this case does not rest upon any of the facts or principles disclosed in them, they are not further noticed.

*Stanberry* and *Leonard*, for the appellants.

I. Roy, the original owner of the equitable title to the seven hundred acres, sold the land to Shackleford. Shackleford, on the 10th April, 1797, sold the land to Upshaw by title bond, covenanting to make a deed. Afterwards, on the 16th July, 1797, Shackleford again sold the land to Buckner, by title bond, received a part of the purchase money, and agreed to wait for the residue until the money could be raised by a resale by Buckner.

In this state of facts the equity to be then administered between the then parties was obvious. Upshaw, as the first purchaser of the equitable title, was to be preferred to Buckner, although he may have purchased from Shackleford without notice.

The rule *prior in tempore, potior in jure,* would then have applied, for there was no laches, acquiescence, or fraud chargeable to Upshaw.

Next in order was the resale by Buckner to the complainants, the payment in full to Buckner, execution of deeds by Buckner to the purchasers, and the taking possession of the lands by the purchasers.

Notwithstanding all this, at that point of time, so far as any fact is yet developed, Upshaw's equity was the best. He stood then upon his first purchase of this equity. The subsequent sale by Shackleford to Buckner was in fraud of his title, and he had given no authority for such subsequent sale, and stood wholly unaffected by it.

But after all this, on the 18th April, 1801, Upshaw enters into communication with Shackleford, the fraudulent vendor, and they enter into an agreement under seal, in which it is recited, that the

sale made by Shackleford to Buckner, had been made with Upshaw's consent; they cancel the prior agreement which witnessed the first sale from Shackleford to Upshaw; and Shackleford agrees to assign to Upshaw the contract with Buckner, and to authorize him to receive the money due from Buckner; that is, the £420, with interest at 5 per cent.

In conformity with this arrangement, on the 7th May, 1803, Shackleford delivered to Upshaw, Buckner's order on Copland for the Coats money; and on the 16th of the same month assigns to Upshaw the contract with Buckner; and on the 17th of the same month, Upshaw releases Shackleford from the contract in which he had made the first sale to Upshaw.

After all this, there remains no question between different equities. The prior equitable title of Upshaw was extinguished. He could no longer assert his prior equitable title as superior to that of Buckner, but must stand in the shoes of Shackleford, and recognise the equity of Buckner. The bill alleges that Shackleford made the second sale to Buckner with Upshaw's consent. Upshaw denies any prior consent, but says he assented to it qualifiedly afterwards. I do not know that it makes much difference, as to the extinguishment of his prior equitable title, whether the assent was prior or subsequent to the second sale; but as the proof stands, the prior consent is established beyond all denial. He has acknowledged under his seal, that Shackleford had made the sale with his consent, and that stops him from saying the contrary.

And again, if the consent to the second sale, whether prior or subsequent, did not extinguish Upshaw's prior equity, it is extinguished by express release in the agreement between himself and Shackleford of the 17th May, 1803.

Upshaw, therefore, must stand upon the contract between Shackleford and Buckner. He must stand as the assignee of the vendor to Buckner.

Let us now examine that contract, and ascertain what interest passed by it to Buckner, or upon a resale by him to these complainants, and what interest remained in the vendor.

At the date of this contract, the legal title to this seven hundred acres was in the United States. A patent had been granted for it by the state of Virginia to Roy, the warrantee, but it

**F**

was wholly inoperative, being made years after the deed of cession.

The subject-matter of sale was, therefore, an equitable interest in land. This interest passed effectually to Buckner by a written contract, sufficient to satisfy the statute of frauds; and this, notwithstanding the purchase-money was not paid. Hampson v. Edelen, 2 Har. and Johns. 64. It passed in the same manner upon the sale by Buckner to the complainants.

What remained in the vendor, Shackleford, or in Upshaw, his assignee? No title, no interest in the land. If any thing remained, it was simply a lien for the unpaid purchase-money, as against Buckner, while the land remained unsold by him.

Twenty-nine years after this sale to Buckner, Upshaw, pretending to be the owner of this equitable title, obtained a patent from the United States. If he had, at the time he so procured the patent, no title to the land, and no lien upon it for the purchase-money, the consequence is irresistible that he holds it as trustee for the real owner.

I have shown he had no title to the land. Let us now inquire if he had a lien upon it.

The lien of the vendor for his unpaid purchase-money arises as well upon the sale of an equitable interest as upon a conveyance of the legal title. It is a creature of equity raised between the immediate parties to the contract; and sustained only against subsequent purchasers when affected with notice of it.

There is no other lien or charge upon an estate so shadowy and so little obvious as this lien of the vendor. It is never to be found of record; it does not depend upon possession of the estate or the muniments of the title. It is not sustained by any matter of constructive notice, but onl · exists as to third persons fixed with actual notice.

The essence of this lien is that the vendor looks to the land alone for the money, or the land and the purchaser.

If he takes collateral security, such as the note of a third person, or if he takes simply a mortgage on the land for only a part of the purchase-money, or if he does any other act manifestative of an intention to look primarily to any other fund than the land,

the lien never arises. Or when the lien has first attached, if he assigns the note of the vendee, or if he is guilty of laches, the lien is gone.

We claim no lien ever existed upon this land in favour of Shackleford, or Upshaw, his assignee.

1. Because the contract of sale looks to a resale, and to the fund arising upon such resale, as the fund for payment, and does not look to the land.

Shackleford agrees to wait for the unpaid purchase-money until Buckner should sell the land. The moment the land is sold the purchase-money becomes due; but, if it is not sold, the purchase-money does not become payable until fourteen months after the date of the contract.

Whenever the contract contains such consent to a resale, and looks to the fund to be produced on a resale, there is no lien on the land. Sugd. Vend. 552. Ex parte Parker, Glyn and Jam. 228. Coad *v.* Pollard, 9 Price, 544; 10 Price, 109.

We do not pretend that Buckner was the agent of Shackleford in making the resale, and that, therefore, payment to him was payment to his principal. We do not put this as a case between principal and attorney. The simple question is, after such a contract, after such an agreement, after a sale to a third person, and payment in full by that third person, can the vendor say to the new purchaser, "You have paid your immediate vendor just as I agreed you should, and I took his covenant. I relied upon his faith to pay me the money; but he has not done so, and I now require that the loss shall fall upon you and not upon me, and that you shall now pay me again for the same land which I consented you should first pay for to another!"

Now, putting the case in the strongest light for Upshaw, placing him in the situation of a vendor, not the mere assignee of the vendor, investing him with a legal title retained upon the sale to Buckner, yet, is it not clear, that a court of equity would compel him at once to convey that legal title to the second vendee, who had fully paid his purchase-money?

Whenever the holder of a legal title encourages a purchaser to deal with another for his estate, or invests another person with the means of imposing upon others as the true owner, or is silent when a purchaser is dealing with another for his estate, a court

of equity will never allow him afterwards to assert that legal title against the purchaser.

In a court of equity, when the conscience of the party is not affected, the holding of the legal title is every thing. A satisfied mortgage, an outstanding term, a deed surreptitiously obtained, are equally available; but, where in reference to third persons the conduct of the holder of the legal title has been such as that it would be inequitable to assert it against the holder of the equitable title, then a legal title is no protection. 1 P. Williams, 393; 3 Russel, 1; Sugd. Vend. 728; Finch's Rep. 28.

It is said the complainants were bound to know what sort of title Buckner had, that they must be taken to know that he held only by contract and had not paid his vendor.

Take it as granted, and suppose them to have had notice of the very article under which Buckner held, and what then? What is the language there held by Shackleford? "I consent that, in order to raise a fund to pay me what is yet due, you may sell this land to others; they are to pay for the land to you, not to me, and you are to pay it to me. I look, not to the land, but to the fund which is to come in place of the land, and I trust you to receive and pay it over to me. I give you fourteen months to pay the money, if you do not sooner sell the land; but the moment you sell it, if it be to-morrow, you are to take the money you receive and out of it pay me my debt."

We say, therefore, because of this clause of resale, there was no lien on the land.

II. Lien lost by laches.

But, if there was a lien for the purchase-money after the sale to the complainants, we next claim that it was lost long ago by laches of Upshaw.

We have shown that Upshaw stood, not as vendor, but simply as his assignee of the debt due for the purchase-money. He was once connected with this land as a purchaser; but we have shown that he released the interest so acquired to Shackleford, and agreed to take a certain sum of money instead of the land. He had, therefore, in fact, only a money claim. The land was never his, nor intended to become his.

We take it as granted, in this view of the case, that he might look to the land as security or means of payment, but he had

Buchannon et al. *v.* Upshaw.

other security, the money due from Coats for a part, and the re-
sponsibility of Buckner for the whole. Time and laches would
bar him of all these securities. The debt was the principal thing,
the lien on the land the mere incident. Time would bar the
debt. It would be most singular that after a lapse of thirty years
we should find not only this debt yet valid, but the mere collate-
ral lien which attended it also in full vigour. It would require
sleepless vigilance to bring that about. Instead of this, there has
been, so far at least as the lien is concerned, the most culpable
negligence.

The Coats bond covered only part of the debt, £250 out of
£420; for the difference, £170, Upshaw could look only to Buck-
ner or the land. Nothing appears to show that any step was
taken by Upshaw on the Coats claim. A suit had been brought
upon it in 1798, three years before he became the assignee of
Shackleford. Judgment was rendered on it in 1800, and the
writ of *ca. sa.* had been in that year returned, not found. The
original suit had been commenced by *capias*, bail given, but no
suit appears even to have been brought on the bail bond. An
*alias ca. sa.* in 1801, never returned, is the last step taken upon
the judgment. For the nine succeeding years no step is taken.
On the 4th January, 1809, Buckner takes the matter in hand, and
gives a power of attorney to Marshall to collect the money from
Coats. In 1810, a bill is filed, in Buckner's name, against Coats's
representatives, to set aside a fraudulent settlement, which is con-
tinued for ten years, and then dismissed upon the default of the
plaintiff, December, 1820.

There is no evidence of the slightest action of Upshaw in these
proceedings, nor is any thing of the sort stated in the answer.
The only statement in the answer is, that the suit against Coats
" was diligently prosecuted." It is not said by whom. We
have seen, however, how diligently.

Then as to the claim on Buckner. The steps taken by Buck-
ner are the following :

In April, 1804, (three years after the assignment from Shackle-
ford,) Upshaw sent by John H. Upshaw to demand the money.
It was not paid, and the claim was put by John H. Upshaw in
the hands of O'Bannon for collection, who received $200 from
Buckner, but did nothing more.

In December, 1805, Upshaw assigned £500 of the Buckner debt to John H. Upshaw, and gave him an order on O'Bannon, April 1, 1807, to receive the money if collected. This order was protested for nonpayment. Nothing further is done for seven years; until February, 1814, when Upshaw commences a suit, in his own name, against Buckner, on the Shackleford contract. Buckner demurred to declaration; on the ground that the action should have been brought in Shackleford's name, and the demurrer was sustained, and judgment upon it against Upshaw at May term, 1815. This was the end of all vigilance as to Buckner, who lived until 1820, and then died possessed of large real and personal estate. His estate has since been settled, and it appears it was not necessary to sell his real estate to pay his debts.

This is the sum total of vigilance as to Coats and Buckner, showing the most tardy proceedings, and those defeated by the gross ignorance of Upshaw's agents.

Now it would be strange if all this delay has not wholly defeated all prospect of a recovery, of either the Coats claim, or the debt against Buckner. In all probability the Kentucky statute has long since barred an action in favour of Shackleford or Buckner; or, if there be no limitation in that state as to specialty debts, as we believe is the case, the presumption of payment is conclusive. And the Virginia statute has barred the action against Coats's bail, or against the sheriff for failing to return the last *ca. sa.* Or, if there was no bar by limitation or presumption, the assets of Coats and Buckner are beyond the reach of their creditors. One has been dead nearly forty years, the other (Buckner) twenty-two years.

With what conscience can Upshaw, after all this delay and loss, seek to make these purchasers from Buckner again pay for their lands? If he had come forward in good time, they undoubtedly might have reimbursed themselves, by action against Buckner, either upon the covenants in his deed or (by subrogation) on the contract with Shackleford; but as it is, his negligence has put that beyond reasonable probability.

But if Upshaw had been vigilant against Coats and Buckner, it is no excuse for his laches as against these complainants. He did know, as early as 1799, that these complainants were in possession of these lands, claiming and improving them as their own.

Now in 1815, he was pursuing Buckner for the money; and up to 1820 the suit in chancery was going forward as to the Coats claim. He still considered the contract as open, and never makes any demand of these complainants. In 1818, he seeks to turn them out of possession by an action of ejectment. He does not ask them for the money. He does not exhibit his right to receive it; but demands their land, and when he comes to show his right to that, he exhibits nothing but a void patent.

He then lies by for eight years, until 1826, and obtains a patent from the United States by means of his deed from Roy the warrantee, which deed was obtained in confirmation of a contract which he had released and rescinded; and at last in 1829, after these complainants had been in peaceable possession, to his knowledge, for thirty years, he brings his last ejectment, and seeks to turn them off the land.

Now, so far as his right to make these complainants pay him Buckner's debt is concerned, there has been no demand for thirty years, and in the mean time, in consequence of his laches, these complainants have lost all chance of indemnity from Buckner.

Such laches will bar not only a mere equitable lien for purchase-money, which is the most that Upshaw ever had, but in equity it would bar a legal title, especially one obtained from a mere trustee, under circumstances like the present.

The rule *prior in tempore* does not apply where the holder of the first equity is guilty of laches. Sug. Vend. 728, 729.

We claim, therefore, that Upshaw is not entitled to demand the Buckner debt from the complainants. If he is entitled to any relief against the complainants, it is only to that. But the decree of the Circuit Court goes quite beyond that, and gives him the land itself, and, in addition, a sum of money for rents and profits larger than the Buckner debt, principal and interest!

This part of the decree proceeds upon the idea that he sold this land—that he stands as vendor—his purchase-money unpaid—guilty of no laches; and that these complainants, as purchasers, have refused to pay him their purchase-money, or have wrongfully delayed it so long, that he can rescind it, and take back his land. I have already shown the gross laches on his part, so gross, that if he was the immediate vendor of the complainants,

and they had agreed to pay him the purchase-money, he could not recover it, but it would long ago have been barred, or presumed to be paid.

But the complainants, what have they done to lose their land to Upshaw?

He is not their vendor. He is (as has been shown) the mere assignee of a debt, never looking to this land but as a means of securing its payment. He has never demanded payment of them. With full knowledge, he allowed them to go on for thirty years, wasting the best of their lives in reclaiming this land from the wilderness. They have been guilty of no laches—of no bad faith. They say in their bill that they were in total ignorance of his claim, or of any defect in their title, until he recovered against them in the last ejectment; and all this Upshaw admits in his answer. They never refused to pay the Buckner debt, for it was never demanded of them.

And if they had refused, that refusal would not have prejudiced them; but they still would have saved their land, by application to equity. That debt was not of their contracting. It was *res inter alios.* They had a right to have it fully sifted in this court. No one can doubt this.

Again. If it were the case of vendor and vendee, before the vendor can count time and laches against the vendee, and go for a rescission, he must show himself ready and able to comply with his contract. Wilson *v.* Tappan, 6 O. Rep. 175.

Upshaw could not demand either money or land, until 1826, for he could never before that day make a title. And up to this moment he cannot perform that very contract, with which he is connected as assignee—the contract between Shackleford and Buckner. If these complainants are to pay the purchase-money for Buckner, they can only be asked to do so upon having the benefit of that contract and a performance from the other party. Shackleford stipulates to make Buckner a warrantee deed, and that deed Upshaw has not yet produced. If Shackleford is dead, we must have such a deed from his representatives as binds his estate. Upshaw's deed will not satisfy the contract. We do not know what he may have done to encumber the title, or how safe we would be with his warrantee. We are not bound to take it as of course.

Further, before Upshaw could rescind the contract and take the land, he must place us, as Buckner's assignees, in *statu quo.* He must give us the claim on Coats; he must transfer to us the claim on Buckner, and he must pay back to us the money he received from Buckner.

Lastly. The contract for the one thousand seven hundred acres is one; it must be rescinded *in toto,* or not at all; and as to the one thousand acres it can never be rescinded, for that part of it is performed.

III. If the court require the complainants to pay the Buckner debt, a question arises, whether a *pro rata* allowance be made for the £600 paid by the Anderson bond.

It is clearly right to allow that credit. Shackleford sold to Buckner two tracts as one, for an entire consideration of £1020. The contract speaks of the two tracts; that is, the tract of one thousand acres, and of seven hundred acres, " as the one thousand seven hundred acres." There is no price fixed for one as distinct from the other; the sale is *in solido.* The £600 is paid and endorsed generally upon the contract. No application was made to one of the tracts by the parties at the time of the payment. Indeed, without the concurrence of both the parties, such special application could not be made. The contract did not admit it, for here was no case of two debts, or of two tracts of land, with distinct sums due for each. There was but one debt, due for two tracts of land, sold as one.

IV. As to the rents and profits and improvements.

If the court are of opinion that Upshaw is entitled to the land, the remaining question is upon that part of the decree of the Circuit Court which touches the allowance to be made to Upshaw for rents, and to the complainants for improvements.

The decree gives to the complainants their improvements made up to the year 1818, without interest; and to Upshaw the annual rents and interest from 1818 to 1840, by which, in addition to the land, now worth from $15,000 to $20,000, Upshaw recovers a decree against the complainants for $4762 30, being a little more than the balance due upon the Buckner debt!

We claim the true rule to be, to allow improvements up to the time of bringing the ejectment upon which the land was recovered, and to charge rents from that time.

This is according to the rule fixed by the occupying claimant law of Ohio.

It is said that law does not apply to this case, as the title of the complainants is not adverse to that of Upshaw.

It is shown that the complainants took the possession under a claim of the fee, having paid their vendor in full, and taken a conveyance in fee. They did not hold in subordination to any one. Their possession was therefore adverse. Jackson *v.* Ellis, 13 Johns. 118. The occupying claimant law, therefore, furnishes a rule of adjustment which this court will follow. Bank of Hamilton *v.* Dudley's lessee, 2 Peters, 526.

*Morehead* and *Cox* argued for the appellee upon the following grounds.

The appellants have not sustained by proof the material allegations in their bill.

1. The appellants in their bill charge that Shackleford was authorized by the appellee to sell the land to Buckner; the answer negatives the allegation, and there is no proof contradicting the answer.

2. The appellee, however, admits that in 1800 he gave his conditional assent to that sale; and if the condition had been complied with on the part of Buckner, his assent would in equity be construed as having relation back to the time of Shackleford's contract with Buckner, and have bound him to convey the land. The conditions on which his assent to that contract was obtained are, Shackleford agreed to assign him the contract made with Buckner, and give him full power and authority to receive from Buckner the £420 then due for the land, with interest thereon, at the rate of 5 per cent. per annum, from the 1st day of December, 1797, till paid, and Buckner was to pay him the money thus due; and, on those conditions being complied with, the appellee assented to the sale, and bound himself to convey the land to Buckner.

3. The conditions on the agreement to perform which the assent of the appellee was obtained, as aforesaid, so far as the same were to have been performed by Shackleford, were never performed by him until the 16th of May, 1803. Until those conditions were performed by Shackleford, the appellee had no

power or authority to apply to either Buckner or Coats for payment, or to receive and receipt for the purchase-money, if the same had been tendered to him. The written order on Copeland, which Buckner gave to Shackleford, to which we have already referred, was never transferred by Shackleford to the appellee; so that the appellee never had any thing to do with the collection of Coats's bond, or any authority to receive the money due thereon, had it been collected.

4. That part of the condition, namely, the payment of the £420, with interest, &c., which was to have been performed by Buckner, has never been performed, either by him or by any other person for him. The payments credited on the contract between Shackleford and Buckner, while the same remained in possession of O'Bannon, were never received by the appellee. O'Bannon had no authority from the appellee to receive from Buckner partial payments on the contract. His authority was limited and confined to the receipt of the entire sum due and the delivery of the deed. The allegation in the appellant's bill, that O'Bannon was duly authorized by John H. Upshaw, whom they charge was invested with power of substitution, to receive from Buckner partial payments on said contract, is positively denied by the appellee in his answer, and that denial is fully sustained by the depositions of John H. Upshaw and the receipt given by him to the appellee, for the said original contract left with O'Bannon, and power of attorney dated April 4, 1804, to which the court is respectfully referred. From that denial, and those depositions and receipts, we draw these conclusions: 1st. That the appellee executed a deed to Buckner, as an escrow, and placed the same in the hands of his agent, John H. Upshaw, for the purpose of being delivered to Buckner, upon the receipt from him of the £530 9s., the purchase-money then due on the land. 2d. That, for the purpose of avoiding any difficulty with Buckner respecting the conveyance of said land, the appellee empowered his said agent, on the receipt of the said purchase-money, to execute to Buckner such other or further conveyance or assurance as might be deemed necessary, in order to invest in Buckner a perfect title. 3d. That said agent was not empowered to receive partial payments on said contract, but was limited and confined to the receipt of the entire sum due. The words in the

Buchannon et al. *v.* Upshaw.

power referred to in said receipt are, "and to receive of said Buckner the sum of five hundred and thirty pounds," &c., "for the above land." The appellee was willing to confirm the contract upon being paid the entire sum due, but not otherwise. He was not, by the receipt of partial payments, willing to extend the time of payment of the residue to an indefinite period. 4th. That said agent was not, by his principal, invested with power of substitution. This is inferrible from the fact that no such power is referred to in the receipt which he gave to his principal. 5th. That the power given to said agent by his principal does not contain, as charged in the appellant's bill, a clause authorizing him to receive any balance that might be due on said contract, if any was due. 6th. That the power given by said agent to O'Bannon was not greater than said agent himself possessed; for said agent deposes and says, "I certainly did not consider myself authorized to tender Buckner a title until the money was paid, and I certainly did not give to O'Bannon a power greater than the one possessed by myself." And, 7th. That O'Bannon was not the attorney of the appellee for the purposes charged in the appellant's bill. If these conclusions are sustained by the premises, it results that O'Bannon had no power derived from the appellee to receive partial payments on the contract, and that the credits endorsed on said contract by him must be laid out of the case. The *onus* of sustaining O'Bannon's authority to receive partial payments rests with the appellants, and they have totally failed in proving the truth of their allegation. The credits endorsed on the contract refer to receipts given to Buckner. The appellants claim under Buckner; why, then, if those payments were made on said contract by the authority of the appellee, do not the appellants produce those receipts, and the authority granted to O'Bannon, authorizing him to receive those partial payments? The appellants have presented no valid excuse for their non-production; and the very fact of keeping back those documents, if such really exist, raises a suspicion that all was not right, and that, if they were produced, they would prove the allegations in their bill to be untrue. The two payments endorsed without the authority of the appellee must, therefore, we respectfully submit, be laid out of the case.

The £600, the proceeds of Anderson's bond, was applied in

payment of the money due by Buckner to Shackleford on the one thousand acres of land surveyed for Javin Miller, and which was sold by the latter to the former, as aforesaid, and no part of that sum was applied in payment of the lands in question. This position is sustained from the following facts and circumstances:

1st. Shackleford, at the time he contracted with Buckner, was invested with the equitable title to this one thousand acres, but he was not invested with either the equitable or legal title to the seven hundred acres of land in question, and it is therefore reasonable to infer that he applied that sum to the payment of the debt due to himself.

2d. £600 was the precise sum which was to be paid by Buckner to Shackleford for that one thousand acres of land.

3d. In 1803, Shackleford procured Chamberlayne, the patentee of said one thousand acres of land, to execute a deed of conveyance for the same to Buckner, and the said deed and the patent which Chamberlayne had obtained for the land were afterwards transmitted to Buckner, by the hands of the appellee or his agent, John H. Upshaw. Would Shackleford have done that if any portion of the purchase-money still remained due to him by Buckner?

4th. When Shackleford, in 1800, first informed the appellee that he had sold to Buckner the seven hundred acres of land in question, and agreed to assign to him the contract he had made with Buckner, he stipulated with him that the entire purchase-money was still due for the land by Buckner.

5th. When Shackleford, in 1803, assigned to the appellee the contract he had made with Buckner, (for the sale to him of the lands in question,) he covenanted with the appellee that there was then due by Buckner, on said contract, the sum of £530 9s.

6th. When John H. Upshaw, as agent of the appellee, afterwards called upon Buckner for payment, he acknowledged that the entire sum was due, and promised to make payment in some short time, if said agent would wait. The said agent did wait, as requested, but no payments were made to him by Buckner.

We therefore assume it as an indisputable fact, that no part of the purchase-money for the lands in question was ever paid by Buckner, either to Shackleford or to the appellee, or to any other person authorized by the appellee to receive and receipt for the

same. No money was ever collected, either by Shackleford or the appellee, on Coats's bond. The defence successfully made by Buckner in the Circuit Court of Kentucky to the action brought by the appellee, as assignee, to recover the purchase-money due on the land, evinced a determination on his part not to perform the contract he had made with Shackleford, and, by that unequivocal act, the appellee had a right to declare the contract at an end, and no further obligatory on him; and he did so declare it, and immediately thereafter commenced an action of ejectment in the seventh Circuit Court of the United States, district of Ohio, against the tenants in possession, who claimed to have derived their title under Buckner. To that action, the appellants, or the persons under whom they claim, were admitted as defendants, and, on trial, a verdict and judgment were rendered in their favour, on the ground that the appellee, who was the lessor of the plaintiff, was only invested with the equitable title, under and in virtue of the deed to him from Roy, which was based on a patent granted to him by the commonwealth of Virginia, which bore date subsequent to the date of the deed of cession from Virginia to the United States. Being thus defeated in every attempt made by him, first, to recover the money for which the land had been sold by Shackleford to Buckner, and, second, to recover possession of the land itself, the appellee procured from Roy and wife a second deed of conveyance, and, in 1826, obtained from the United States a patent for the land, on which he instituted an action of ejectment against the appellants, and obtained a verdict and judgment of eviction against them; and in order to obtain a perpetual injunction against further proceedings on that judgment, and to compel a conveyance of the lands in question, the appellant filed the bill under which the decree complained of was rendered.

5. And the question here occurs, were this a suit prosecuted by Buckner or his legal representatives against the appellee, in order to compel the specific execution of the contract entered into between Shackleford and Buckner, for the sale and conveyance of the lands in question, would this court grant the relief asked? Buckner has neither paid nor tendered payment of the purchase-money. Would this court, then, decree in his favour? Is it not a rule in equity, that where the party to a contract not only neg-

lects to perform it, but, by his conduct, evinces a determination not to perform it, that the opposite party is at liberty to put an end to it; and that where the purchaser neglects for an unreasonable length of time, although often requested, to pay the purchase-money, and in the mean time, as in the present-case, the land has increased in value tenfold, that a court of equity will not interpose in his behalf, by compelling the specific execution of the contract? If Buckner had made prompt payment, the appellee could readily have invested the avails of the sale in other western lands, which, at this day, would have been worth thousands of dollars more than the lands in question, with all the improvements which have been made on the lands by the appellants, and have avoided the trouble and expense of many long and wearisome journeys, and the expenditure of thousands of dollars in ineffectual attempts to recover his just rights. Is it not also a rule in equity, that he who asks must himself do equity to him against whom he asks it; and that he who claims the aid of a court of equity must show that he has not only been at all times ready, willing, anxious, and eager to perform the stipulations on his part, but that he has either actually performed or tendered performance on his part, and that the opposite party refused compliance on his part? These principles are so well understood, and have so often received the sanction of this court, that we do not deem it necessary to cite authorities in support of them. We therefore respectfully submit, that were Buckner or his heirs the parties complainant in this suit, that a specific execution of the contract in question would not be decreed by this honourable court.

6. Do the appellants, as against the appellee, stand upon more favourable ground in a court of equity than Buckner or his representative would have stood? No consideration ever moved from the appellants to the appellee as an inducement to the conveyances asked; they never tendered, nor do they, in their bill, offer to pay the consideration money contracted to be paid by Buckner. They were not parties to the contract made by Shackleford with Buckner, and consequently no privity of contract exists between them and the appellee. Upon what ground or principle, then, are the appellants, as against the appellee, entitled to the relief prayed for in their bill? Upon the ground of privity of

contract, they are not entitled to relief, because such privity existed. The appellants have, however, invoked the benefit of the contract between Shackleford and Buckner, which has been assigned to the appellee; but can that contract, if it were admitted they are entitled to its benefit, aid them? The terms of that contract were never performed by Buckner. If they are entitled to the aid of that contract, it must be on the ground, that in equity, though not at law, they must be considered as Buckner's assignees, and consequently, in reference to that contract, as standing in his shoes; and with reference to the appellee, as subject to the same equity to which it was subject in the hands of Buckner. As the assignees of Buckner, they acquired no better title in equity than was vested in Buckner at the time of the assignment. If, therefore, Buckner could not in equity compel the specific execution of the contract in question, neither can the appellants compel it. The assignee of a contract for the sale and conveyance of land, where he himself has neither performed nor tendered performance, must abide the fate which awaited the assignor, where he neither fulfilled nor offered to fulfil the terms of the contracts, the specific execution of which is sought. In Stanley v. Gadsby, 10 Peters, 522, this court is reported to have said; "If a complainant does not aver in his bill his readiness to pay both principal and interest, he can have no standing in a court of equity." The payment or tender of the purchase-money is indispensable on the part of him who asks the specific execution of a contract. Stratford v. Alborough, Ridgeway's Ch. R., and 2 Bligh's R. 596, 4. Again: both Buckner and the appellants have trifled with the appellee; and it seems to be a settled rule in equity, that where one party to an agreement trifles, and shows a backwardness to perform on his part, equity will not decree a specific performance in his favour. Harrington v. Wheeler, 11 Ves. 856. In the case of Edwards v. Parker, lately pending in Brown county, Ohio, which was a bill to enforce the specific execution of a contract, the Supreme Court of the state refused to decree in favour of the complainant, on account of the lapse of time since the contract should have been complied with. S. P. Mayo v. Deschamps, 13 Ves. 25; Grant v. Humphrey, 8 Ves. 815; and Highby v. Whittaker, 8 Ohio, 201. In this last case the purchaser of the land delayed payment of

the principal part of the purchase-money for about ten years after it was due, and the court decided that he could not compel, in equity, the specific execution of the contract; that the trifling indisposition of the complainant, his want of integrity and intention to pay for the property, and his utter inability to do it, unquestionably gave to Burchard, under whom Whittaker claimed, the right to put an end to the contract; and that as the complainant had occupied the land sold, the fair rent of which was equal to the actual payment made, Brunce, the seller, had a right to rescind without offering to refund the amount received. See, also, Remington v. Kelly et al., 7 Ohio R. 103. It is now more than forty-one years since the purchase-money for the lands in question fell due, and during that whole period neither Buckner nor the appellants have either paid or offered to pay the purchase-money; upon what ground, then, can they insist that the decree is erroneous? Every man is to suffer for his own delay or neglect. Speake v. Speake, 1 Ves. 217. The plaintiff in equity, if he either will not, or, through his own negligence, he cannot, perform the whole on his side, has no title in equity to the performance of the other party. Butcher v. Hinton, 1 Ch. Ca. 302; Keen v. Stukely, Gil. R. 155; Pope v. Roots, 7 Bro. P. C. 184; Earl of Evershap v. Watson, Rep. Temp. Finch, 445; 2 Freeman, 35; Hutton v. Long, Temp. Finch, 12. So, if the plaintiff has not performed his part of the agreement, he must, in equity, show that he was in no default in not performing it, but must also allege that he is still ready to perform it. Fields v. Hooker, Merivale, 224; and Fane v. Spencer, Merival., 430, in note. And upon this reasoning it is, that when a man has trifled or shown a backwardness in performing his part of the contract, equity will not decree a specific contract in his favour, especially if circumstances are altered. Hayes v. Caryll, Jan. 1792; 5 Vin. Abr. 538, pl. 18. Neither will equity decree an agreement which appears afterwards to have been discharged by parol, though the original agreement was in writing. Goman v. Salisbury, 1 Ves. 240; Lord Milton v. Edgworth, 6 Brown, P. C. 580; Segal v. Miller, 2 Ves. 299; Inge v. Sippingwell, Dick. 469; Daved v. Simonds, 1 Cox's R. 406; and Stephens v. Cooper, 1 Johns. Ch. R. 420, 430. In the case of Heafly v. Hill, the specific performance of an agreement to grant a lease was refused,

the plaintiff having failed to file his bill for more than two years
since notice from defendant of his intent not to perform his con-
tract, on account of the plaintiff's non-fulfilment of his part of the
agreement. In this case, at the time of service of the declarations
in the first action of ejectment brought by the appellee against
the appellants, the appellants had notice that the appellee did not
intend to perform the agreement in question, on account of the
neglect of Buckner in not paying the purchase-money due on the
land; and yet no payment or offer of payment was made by
them, nor did they file their present bill until more than ten years
had elapsed after the receipt of actual notice that the appellee
considered the contract at an end, and no further obligatory on
him. Even in the bill which the appellants have filed, (but
which they never filed until all their efforts to baffle the appellee
at law had failed,) they have not tendered payment of the pur-
chase-money, unless that clause in the prayer of their bill which
asks for a decree upon such terms as the court may seem just can
be construed as an offer to pay the purchase-money due, with
interest. To construe that clause in the prayer of the bill as an
offer to pay would be giving to it a construction which is incom-
patible with the general frame of the bill, and the grounds on
which the appellants have based their right to the relief invoked.
The appellants have based their right to relief on three grounds:
1st. That Shackleford, or the appellee, neglected to collect the
amount due on Coats's bond. 2d. If that be not true, that they,
or one of them, neglected to collect the purchase-money of Buck-
ner. And, 3d. That the appellee never acquired his legal title
until 1826. And, first, as to Coats's bond: Were it true, as
charged, that it was through the mismanagement or omission of
Shackleford, or the appellee, or both of them, that Coats's bond
was not collected, would the condition of the appellants be im-
proved thereby? We think not. The balance due on Coats's
bond was £250, and the entire sum due was £420. Conse-
quently, there remained due, after deducting Coats's bond, £170,
which fell due in 1799. This balance has never been either paid
or tendered to the appellee. If, therefore, the balance of Coats's
bond was lost through the negligence of Shackleford and the ap-
pellee, or one of them, that negligence only operated as a release
*pro tanto* of the obligation of Buckner to pay, or tender pay-

ment of the purchase-money; and from thence it results, as the £170, with interest, was never paid or tendered, that the appellants are not entitled to the relief which they ask. But is it true that Shackleford and the appellee, or one of them, had the management of the claim against Coats; and that, through their mismanagement or neglect, or the mismanagement or neglect of any of them, said claim was lost? Coats's bond was never assigned by Buckner to Shackleford; nor did the parties stipulate that Shackleford should have the management or control of the suit which had been ordered on that bond. The stipulation on the part of Shackleford was to wait for the amount due on Coats's bond until judgment was obtained thereon. That stipulation was coupled with this condition, namely: that Buckner gave to him an order in writing, on the attorney in whose hands Coats's bond had been placed for collection, requesting him to pay over the money to Shackleford, when collected. Buckner did not give the written order which he covenanted to give, but gave to Shackleford an order of the description promised, on Copeland, who never was employed, nor ever had any thing to do in the collection of Coats's bond. Buckner's covenant was therefore broken; and so much of the purchase-money as was to have been paid by the proceeds of Coats's bond became due on the day the contract between Buckner and Shackleford was executed. But if this be deemed too rigid a construction of Buckner's undertaking, as it respects the order, in writing, he obligated himself to give to Shackleford, yet it is clearly discoverable from the words as well as from the general scope and design of the parties, as expressed in the contract, that Shackleford only stipulated to wait for the £250 until judgment was rendered on Coats's bond. That judgment was rendered in May, 1800, and on that day, at all events, the remaining balance of the purchase-money of the lands in question fell due. Buckner was informed by Shackleford when judgment would be rendered, and that Coats intended to enjoin the judgment. The evidence shows that neither Shackleford nor the appellee had any management or control of the suit on Coats's bond; that neither of them were guilty of any mismanagement or neglect in relation thereto; that the attorney having the management of that suit procured judgment to be rendered thereon at as early a day as practicable; that,

after judgment, every reasonable effort was made to enforce collection, but without effect; that the insolvency of Coats was ultimately ascertained; that, from weighing the evidence with care, the inference is strong that Coats was insolvent in 1797, and that Buckner was duly notified of the result. We therefore respectfully submit, that the first ground assumed by the appellants, on which they assert their claim to relief, has no solid base on which to rest. Their second ground is equally unsustainable. What has the solvency or insolvency of Buckner, at certain periods, to do with this case? He stipulated with Shackleford to pay for the land a certain amount, and within certain periods—uncertain, it is true, at the time of contracting, but which were rendered certain by the happening of the events referred to in the contract: Shackleford waited until those events happened. The £170 fell due at all events in 1799, if not before, and the £250 in the May following, when judgment was rendered on Coats's bond. Shackleford did not stipulate to wait for the purchase-money longer than those periods. If not paid then, he had a right to put an end to the contract. There is no clause in the contract which required him to sue for the purchase-money in case Buckner failed to pay within the stipulated periods. It was therefore optional with Shackleford, on Buckner's neglecting or refusing to pay within the stipulated periods, either to put an end to the contract or to sue for the money due. If Buckner was able to pay, why did he not pay? Until he made payment, the equitable title to the land purchased, or rather contracted for, did not vest in him. There was no consideration to raise a case in him. If he was able to pay, why did not the appellants compel him to make payment? Why did they not see that the money they had contracted to pay Buckner for the land was applied to the payment of the purchase-money which Buckner had contracted to pay Shackleford? The appellants claiming under Buckner are chargeable with notice of the fact, that he only held title under his contract with Shackleford, which obligated him to pay £420, with interest, before he could demand of Shackleford the legal title. Was it not, therefore, their duty to have seen that the purchase-money paid by them was faithfully applied to the payment and discharge of Buckner's contract with Shackleford? Buckner's solvency or insolvency has therefore nothing to do with

the case.   The consideration has never been paid or tendered, and consequently the appellants have no right in equity, as against the appellee.

. But it is also insisted that the appellee never acquired the legal title to the lands in question until 1826; and consequently, until he did acquire the legal title, that neither Buckner nor those claiming under him were bound either to pay or tender the purchase-money.   But did they either pay or tender the purchase-money when the legal title was obtained?   No; they neither did the one nor the other.   How, then, are they entitled to relief on that ground?   They did not offer to do equity when every shadow of suspicion was removed from the appellee's title.   But did the defect in the appellee's legal title excuse them from the strict performance, or at least a tender of performance, of the original contract between Shackleford and Buckner?   We think not.   The appellee's equitable title was perfect, and he, as well as Shackleford and Buckner, believed that he was also invested with the perfect legal title, in virtue of the deed of conveyance from Roy, who had obtained a patent for the land from the state of Virginia.   The attorney who instituted the first action of eject-ment for the appellee, and the appellee himself, must have been impressed with the belief that the appellee was at that time in-vested with the legal title, otherwise the conduct of the attorney was dishonourable and dishonest, and that of the appellee simple and foolish.   Upon comparing dates, it was found that the patent had issued since the date of the deed of cession, and consequently that the appellee was not invested with the legal title.   Did that discovery excuse the appellants from paying or tendering the purchase-money, in pursuance of the terms of the original con-tract?   The appellants either did or did not know, at the time the purchase-money fell due, that the appellee was not invested with the legal title.   If they did know, it was their duty to have tendered the money, demanded a good title, and, at the same time, to have informed the appellee of the defect which existed in the title; and, on the other hand, if they did not know of the defect, they have no excuse for the neglect in making payment. The appellants have presented no valid excuse for the nonpay-ment or tender of the purchase-money, and consequently are not entitled to the relief claimed.

Vol. I.—11

Buchannon et al. *v.* Upshaw.

The conduct of the appellants, evinced by the institution and prosecution of their separate suits, in Clermont county, against the appellee, to which we have referred in the abstract, at the time this suit was pending in the Circuit Court, does not present them or their case in the most favourable point of view before a court of equity. He who asserts a claim in a court of equity ought to present himself with clean hands and a pure heart, if he expeets to receive a favourable response to his petition.

Mr. Justice CATRON delivered the opinion of the court.

This is an injunction bill, to restrain the defendant from taking òut a writ of possession and an execution for costs, on a recovery, of seven hundred acres of land, by Upshaw, in an action of ejectment against the complainants in the Circuit Court of Ohio. They ask a perpetual injunction of the execution, and a specific decree for title.

The complainants, and those under whom they claim, purchased from Philip Buckner, paid a full price, and took deeds dated in 1798 and 1799.

Buckner purchased from Lyne Shackleford in November, 1797, when the latter had no title to, or interest in the land; Upshaw, the respondent, being the owner. It had been granted to Beverly Roy by the commonwealth of Virginia, in 1789, and sold by Roy to Shackleford. In April, 1797, Shackleford sold to Upshaw, and directed the title to be made to him. On the 20th of July, 1797, Roy conveyed to Upshaw; and in November afterwards, Shackleford sold a second time to Buckner.

To remedy this defect of title and want of good faith, in April, 1801, Shackleford entered into a covenant with Upshaw, by which the sale to Buckner, of November, 1797, was confirmed; and in May, 1803, Shackleford and Upshaw entered into another covenant, again confirming the contract between Shackleford and Buckner; and which is more specific in its terms than the first, of 1801.

By these contracts alone Upshaw was bound: and on them the bill is founded, and a specific decree asked. They must be taken together: so the complainants treat them in their bill; nor can the court do otherwise.

Upshaw, having stipulated to make title to Buckner, on receiving £420, the purchase-money, took an assignment of the cove-

nant between Buckner and Shackleford; on which it appears by the covenant of 1803, £420 was remaining unpaid.

It is insisted that a bill for a specific performance of the contracts, could not be maintained until the purchase-money was tendered to Upshaw, the vendor; and of this opinion was the Circuit Court; and principally on this ground, taken in connection with other circumstances, dismissed the bill.

We are of opinion that if such a rule exists in any case, it has no application to the one before us. The complainants purchased from Buckner when he had no interest in the land; and at that time they acquired no equity against Upshaw: yet of this fact they had no knowledge, and rested confident that they were occupying and improving the land under a good title. Nor did they have any knowledge of the contracts between Shackleford and Upshaw, after their purchase from Buckner, for many years; probably not until about the time the recovery was had against them in the action of ejectment in 1831. It was not Buckner's interest to give the information; and Shackleford took no further trouble on himself in the matter after 1803; he and Upshaw residing in the remote parts of Virginia, five hundred miles from the complainants.

Upshaw admits, in his answer, that he did not know Buckner had sold the land; or that it was in the possession of the complainants, until about the time he brought his first action of ejectment, in October, 1818: that he sued for the land, because he had failed to obtain the purchase-money from Buckner. The suit failed, because the patent from the commonwealth of Virginia was void; the country having been ceded (north of the Ohio river) by Virginia to the United States, before the land was granted.

In 1826, Upshaw, on the production of the patent to Roy and his deed, obtained a patent from the United States, in confirmation of the Virginia grant. On this he brought another suit against the complainants; and in 1831, recovered the land. This is the judgment the bill seeks to enjoin.

During all this time, Upshaw was a stranger to the complainants: he set up no claim against them for the purchase-money due from Buckner to him: he sought the land, and disavowed that Buckner's contract with the complainants bound him. And

so he continues to do. His principal defence in the answer to the bill is, "That having no contract, or privity of contract, with the purchasers from Buckner, he conceives they can have no right to come into a court of equity to enforce a specific performance of the contract with Buckner."

It is manifest that at no time were these complainants afforded the opportunity to pay the purchase-money due from Buckner to Upshaw.

We therefore hold, that complainants were in no default prejudicial to their original equities, for failing to discharge, or offering to discharge, the bond of Buckner.

Nor could the complainants be justly charged with sleeping on their rights, had the true state of the facts been known to them. Until 1826, Upshaw was in no situation to comply with his part of the contract; that is, to make title. A court of chancery would have enjoined the payment of the purchase-money before the patent issued from the United States—and set aside the contract, if the vendor could not have made title.

Neither can this be treated as a stale claim, for another reason. The complainants went into possession under Buckner's deeds, dwelt upon, and in good faith improved the land; and are now seeking to protect their possessions and homes, in affirmance of their deeds.

We also hold that there was privity of contract between Upshaw and the complainants. When he sanctioned Shackleford's contract with Buckner, he became a party to it: Buckner had assigned all its benefits to the complainants, and they must be treated as rightful assignees; with the modifications imposed by the contracts of 1801 and 1803, between Upshaw and Shackleford.

The equitable title being in the complainants by a contract complete in all its parts, they are entitled to a specific decree of course, on principles too familiar to require authorities to support them. On this part of the case the court has had neither doubt or difficulty in arriving at a conclusion favourable to a specific decree.

The complainants being entitled to relief, the next question is, on what terms? For as they ask the active aid of the court to coerce performance of the respondent's contracts, they can only have such aid on the terms that they do him equity. A rule

without an exception, within our recollection. Having dealt for an equitable title, complainants took it subject to all the equities existing between their immediate vendor, Buckner, and his vendor, Upshaw It follows, they must perform the covenants favourable to the defendant found in the contracts on which they seek relief. Therefore, before Upshaw can be compelled to convey the land, he is entitled to receive the purchase-money; unless his right is cut off by the contract, or has been forfeited by his subsequent conduct.

The first objection is, that in the contract between Shackleford and Buckner, there is a power given to the latter to sell; until which time Shackleford agreed to wait for a portion of the money: that is, as to £170; provided the resale was made by the 1st of January, 1799: before which time, the sale was made to some of the complainants. It is true in the nature of buying and selling, that where a power of resale is given to the vendee, he has conferred on him the corresponding power to receive payment. But this could not affect Upshaw's title: Buckner took no interest by his contract with Shackleford; nor did the complainants acquire any by their purchase from Buckner. Their equities originated with Upshaw's sanction, given after the power had expired. He might sanction the contract of Shackleford with Buckner, or not, at his election; and, of course, modify it to suit his own interest. Having the transaction in his power, he saw proper to become a party to the contract on the terms that he retained a lien on the land for the £420: First, by the covenant of 1801, he bound himself to Shackleford, to proceed against the land if he failed to receive payment from Buckner: and, Secondly, by that of 1803, he bound himself to convey to Buckner on being paid the £420. The bill being founded on these contracts, Upshaw is entitled to be paid the purchase-money, irrespective of the stipulation that Buckner was authorized to resell, by his contract with Shackleford.

In the covenants of 1801, and 1803, Upshaw admits that Shackleford sold to Buckner with his consent, and it is insisted for complainants that Upshaw must be held to have authorized Shackleford to sell before the contract of 1797 was made. All the evidence we find in the record of Upshaw's sanction, is found in the contracts of 1801, and 1803; by these he was not bound to convey until he received payment for the land; we think in this modi-

H

fied form is Upshaw bound, and that he never intended simply to sanction Shackleford's sale to Buckner.

Next it is contended, respondent was negligent in not collecting a bond upon Coats, on which £250 was due. Upshaw's covenants have no reference to this security. It was delivered over to Shackleford by Buckner for collection; credit was to be given for the money, if collected, on Buckner's bond. The claim was diligently pursued, but Coats proved insolvent: so that there is nothing in this objection.

Again, it is contended, and with much force, that Upshaw was grossly negligent in failing to collect the £420 from Buckner. He received Buckner's covenant in 1803. In 1804, it was sent by John H. Upshaw from Virginia to Kentucky for collection; the agent was fully authorized to receive the money and to make title to the land on its payment; which Buckner evaded, and the contract was put into the hands of another agent, O'Bannon, who collected $200 from Buckner: and in 1814, Buckner was sued in Upshaw's name as assignee, and the suit failed because an assignee could not sue upon such an instrument. During this time, Upshaw had no valid title to the land, although there can be no doubt he thought the Virginia patent valid; still he could not have coerced payment from Buckner until 1826, when the patent from the United States was obtained; had the latter resisted payment on this ground. Under all the circumstances we think Upshaw did not forfeit his right to demand the purchase-money from the complainants.

Shackleford sold to Buckner two tracts of land; one of a thousand acres, and this in controversy of seven hundred acres, for the gross sum of £1020; and obtained £600 on Anderson's bond in part payment. It is insisted that this sum must be applied in discharge of the complainants, as seven hundred is to one thousand; and that they are only bound for the residue.

The complainants are compelled to rely on Upshaw's contracts of 1801 and 1803, to maintain their claim to relief, and to affirm them in all their parts. By these contracts it appears the seven hundred acre tract was estimated at £420, and that no part of the purchase-money for this tract had then been paid by Buckner: he was concluded from asserting the contrary, and so are the complainants.

The next question is, from what time are the complainants bound to pay interest on the unpaid purchase-money. They insist from the time Upshaw obtained his patent from the United states, in 1826. Respondent insists he is entitled to interest from the time the debt fell due against Buckner, or the 1st of January, 1799. Until the complainants were notified that, as purchasers of Upshaw's title, they were responsible to him for the purchase-money, and recognised as his debtors, they had no opportunity to make payment: as to them, the debt was payable on demand, express or implied. Respondent admits in the answer that he neither pursued the land, or the purchasers under Buckner, until he failed to obtain payment from the latter. His first assertion of claim, was by the suit in ejectment in 1818; after which the purchasers cannot be heard to say, they remained ignorant of the defects in their own title, or of Upshaw's rights; it was imposed upon them to trace up the outstanding equities favourable, and unfavourable. Had they done so, the contracts of 1801, and 1803, would have been discovered, and the state of the title explained: this complainants did in 1831; and it could have been done quite as conveniently in 1818. We therefore deem the suit equivalent to a demand.

That Upshaw had no legal title in 1818, is no excuse: The complainants entered upon, occupied, and enjoyed the fruits of the land, under his title; and could no more be allowed to disavow it while they remained in possession, than could a tenant for years, be permitted to disavow his landlord's title. So in effect, this court held in Galloway *v.* Finley, 12 Peters, 264. But being remote purchasers of Upshaw's title; not from him, but another; and only bound to pay the purchase-money by the rules adopted by courts of chancery; by the same rules, the complainants are entitled to an abatement of interest in part, accruing on Buckner's contract: and as the right to receive interest depends on the time when Upshaw notified them that they were held responsible for Buckner's failure to pay; and the action of ejectment, of October, 1818, being equivalent to a demand of payment, legal interest accrued from that date.

This we deem a well-founded principle, where a personal demand existed upon real security, and is brought forward at a late

day. Interest may be allowed at the discretion of the court, only from the time of filing the bill, in such cases. The rule is established in the Court of Chancery in England, and can be properly applied in this case. Pickering v. Lord Stamford, 2 Ves. jr. 272, 582. And under similar circumstances it equally applies where mesne profits are claimed. Acherly v. Roe, 5 Ves. 565.

We order that the $200 paid to O'Bannon be deducted from the £420; leaving $1200 due: on this sum interest will be allowed from the 15th of October, 1818, until paid. As the record does not show when the action of ejectment was brought, we assume the middle of the month as the true time; the interest to be after the rate of six per cent. per annum.

The purchase-money will be apportioned among the complainants, according to the original value of the several tracts when purchased from Buckner: and the price paid to him taken as the measure of value. Those claiming under Buckner's vendees, will be governed by the same rule, of their vendor's. If the money is not paid in a limited time, sales will be ordered, of all, or any of the tracts, at the discretion of the Circuit Court, to raise the money.

The injunction at law, in so far as to restrain the writ of possession, will be made perpetual: but will be dissolved as to the judgment for costs, so that an execution may issue to collect them.

The costs of this suit in the Circuit Court, will be equally divided between the complainants, and the respondent, Upshaw; they paying half, and he the other half: and the complainants will contribute among each other, in the same proportion that they are bound to do in discharging the decree for the purchase-money.

The appellee Upshaw will pay the costs of this court.

On the complainants discharging the purchase-money, the contract between Buckner and Shackleford will be assigned to them by Upshaw, if he is required to do so: and he will also be decreed to execute deeds to the complainants for the tracts they respectively claim, in such form, and with such covenants, as the Circuit Court shall direct.

The decree of the Circuit Court for the mesne profits, falls of course by the reversal of the principal decree.

ORDER.

Edwin Upshaw, Appellant,
*v.*
Buchannon and others.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Ohio, and on the cross appeal by Edwin Upshaw, and was argued by counsel. On consideration whereof, it is now here adjudged and decreed by this court, that the said appeal of Edwin Upshaw be and the same is hereby dismissed, with costs.

Buchannon and others, Appellants,
*v.*
Edwin Upshaw.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Ohio, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be and the same is hereby reversed with costs, and that this cause be and the same is hereby remanded to the said Circuit Court, with directions to proceed therein conformably to the opinion and decree of this court.